Frank J. ELLIS, to his own right and on behalf of numerous other voters of Baltimore City who are similarly situated, Plaintiff,

v.

MAYOR AND CITY COUNCIL OF BALTIMORE,

and

Board of Supervisors of Elections of Baltimore City, Defendants.

Civ. A. No. 14555.

United States District Court
D. Maryland.

Oct. 20, 1964.

Archie D. Williams, Baltimore, Md., for plaintiff.

Joseph Allen, City Sol., Clayton A. Dietrich, and Harold I. Glaser, Asst. City Sols., Baltimore, Md., for defendants Mayor and City Council of Baltimore.

Thomas B. Finan, Atty. Gen. of Md., Robert F. Sweeney, Asst. Atty. Gen., Baltimore, Md., for defendant Bd. of Supervisors of Elections.

Before THOMSEN, Chief Judge, and NORTHROP and WINTER, District Judges.

WINTER, District Judge.

By his Second Amended Complaint plaintiff, a resident and registered voter of Baltimore City, sues on his own behalf and on behalf of all of the voters of Baltimore City who are similarly situated, for declaratory and injunctive relief that (a) the apportionment of city councilmen as presently prescribed in Section 16 of the Charter and Public Local Laws of Baltimore City (1949 Ed.) (hereafter called "Baltimore City Charter") is in violation of the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States, and (b) that Resolution No. 9 of the Mayor and City Council of Baltimore, approved May 30, 1963 (hereafter called the "Resolution"), to redistrict the City of Baltimore and to reapportion the City Council, would, if adopted, similarly violate the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States. Unless enjoined by this Court, the Resolution will be submitted to the voters of Baltimore City for adoption or rejection at the general election to be held November 3, 1964. Plaintiff's latter prayer for relief rests upon alternative major contentions that (a)

the Resolution is invalid, because adopted by a City Council unconstitutionally apportioned, and (b) if validly adopted, and if approved by the voters, the Resolution would violate the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States.

The Court has jurisdiction by virtue of 28 U.S.C.A. § 1343(3) and 42 U.S.C.A. §§ 1983 and 1988. There is no claim that a statutory three-judge court is required by virtue of the provisions of 28 U.S.C.A. § 2281, because only the validity of a municipal resolution is involved, and only local officials are sought to be enjoined.[1] The case was called for trial and evidence taken before a single judge on September 22, 1964, but, when it became apparent that certain parties having a potential interest in the case had no knowledge of its existence, that the parties had not submitted all of the evidence needed to decide the case, and that the case involved a question of great local interest, an order was entered directing the parties to present proof which the Court needed for final disposition of the case, the order was served on a number of potentially interested persons, and additional judges of this Court were invited to hear and to participate in its decision. The case was subsequently reheard on October 5, 1964.

Suit was initially filed on April 5, 1963. At that time the principal relief requested was a declaration that Section 16 of the Baltimore City Charter, which fixes the number and election of members of the City Council,[2] was invalid for violation of the Equal Protection Clause, and that the Mayor and City Council of Baltimore be required to effect an appor-

---

[1]. Ex parte Collins, 277 U.S. 565, 48 S.Ct. 585, 72 L.Ed. 990 (1928); Petition of Public Nat. Bank of New York, 278 U.S. 101, 49 S.Ct. 43, 73 L.Ed. 202 (1928); Uihlein v. City of St. Paul, 32 F.2d 748, aff'd. 38 F.2d 1020 (8 Cir. 1929), cert. den. 281 U.S. 726, 50 S.Ct. 240, 74 L.Ed. 1143 (1930); Davis v. City of Little Rock, 136 F.Supp. 725 (D.C.Ark.1955); Teeval Co. v. City of New York, 88 F. Supp. 652 (D.C.N.Y.1950). See, generally, Annot., 83 L.Ed. 1193 (1939).

[2]. § 16 of the Baltimore City Charter does not fix the maximum number of City Councilmen. Rather, it prescribes a formula, application of which results in there being 20 councilmen at the present time. § 17 of the Baltimore City Charter also provides for a President of the City Council who is elected by the voters of Baltimore City, at large. The President is the presiding officer and has a vote on all questions before the Council.

tionment of city councilmen among the several councilmanic districts so as to give the plaintiff, and others similarly situated, equal representation in the City Council of Baltimore City. At about the time of the filing of the suit, the then Mayor of Baltimore City appointed a commission of legislative, business and civic representatives to propose and present to the Mayor and City Council of Baltimore and, ultimately, to the voters of Baltimore, a redistricting proposal providing for substantially equal representation in the City Council. Plaintiff amended his Complaint to allege that the appointment of the commission was a political gesture, engaged in for the purpose of deceiving the Court, and that any redistricting and/or reapportionment undertaken at a time at which plaintiff was not adequately represented would violate his constitutional rights. Plaintiff added another prayer to his requested relief, i. e., that the Mayor and City Council of Baltimore be restrained from proceeding to redistrict the city until such time as a valid reapportionment had been accomplished.

A hearing in this Court was not pressed, and the commission (hereafter called the "Bard Commission")[3] carried on its proceedings and drafted a redistricting plan (commonly referred to as "Plan X"). The report of the Bard Commission was dated April 23, 1963. Thereafter, Resolution No. 2572 was introduced in the City Council, embodying the recommendations of Plan X. With amendments satisfactory to the Bard Commission, the Resolution was passed unanimously on May 16, 1963, and is now known as Resolution No. 9 of the Mayor and City Council of Baltimore, approved May 30, 1963.[4] By its terms it would submit to the voters of Baltimore City, at the November, 1964 general election, proposed amendments to Sections 16 and 20 of the Charter of Baltimore City. Section 16 of the Charter, as it presently exists, is set forth in the margin.[5] The Resolution would amend this section to provide that councilmanic districts having not more than 70,000 voters would elect three members of the City Council, while councilmanic districts having more than 70,000 voters would elect four members to the City Council.[6] Section 20 of the Charter, as it now exists, fixes the boundaries of the councilmanic districts as set forth in

3. The Commission was headed by Dr. Harry Bard, the President of Baltimore Junior College, lecturer on Political Science at McCoy College of The Johns Hopkins University, and author of books on Political Science and Government.

4. Plan X, as amended by the City Council, will be referred to as "Modified Plan X" in this opinion.

5. "16. CITY COUNCIL—*Number and Election of Members.* The voters shall elect the members of the City Council on the Tuesday next after the first Monday in May in the year 1947 and every fourth year thereafter. Their term of office shall be four years. Said election shall be held by Councilmanic Districts and no person shall be entitled to vote for any member of the City Council except for the members for the District in which the voter is duly registered. *The number of members to be elected from each District shall be determined as follows: three members for each District in which there were not more than 75,000 voters* at the close of office hours of the Board of Supervisors of Elections of Baltimore City on the first Monday in December prior to the election; *four members for each District having more than 75,000 such voters.* (emphasis supplied)
"The determination of the number of registered voters in each District, shall be made by the Board of Supervisors of Election of Baltimore City and an appropriate certificate with respect thereto shall be filed by said Board with the Mayor and with the President of the City Council not later than the Friday following the first Monday in December prior to the date on which members of the City Council are to be elected."

6. "16. The voters shall elect the members of the City Council on the Tuesday next after the first Monday in May in the year 1947 and every fourth year thereafter. Their term of office shall be four years. Said election shall be held by Councilmanic Districts and no person shall be entitled to vote for any member of the City Council except for the members for the District in which the voter is duly

the Land Records of Baltimore City lodged with the Clerk of the Superior Court of Baltimore City.[7] The Resolution proposes an amendment to Section 20 to re-state the councilmanic districts by actual description contained in the Resolution.

Notwithstanding that the Resolution was finally adopted on May 16, 1963, plaintiff did not undertake to file his Second Amended Complaint until March 4, 1964.

Plaintiff contends, firstly, that the present apportionment of the City Council of Baltimore is unconstitutional. This conclusion is said to result from the terms and provisions of Section 16 of the Charter, in that the formula specified in Section 16 lacks rational basis, and it is theoretically possible that under this formula a councilmanic district having a very small number of residents and an even smaller number of registered voters would elect not less than three councilmen, while a district having a very large number of inhabitants and voters would elect not more than four councilmen. The present invalidity of Section 16 is also urged when its impact on the present population and voter registration among the several councilmanic districts in relation to the number of councilmen elected by each of those districts is considered.

Stemming from the conclusion that the City Council is presently unconstitution-ally apportioned, the plaintiff argues, secondly, that Modified Plan X is invalid because it was adopted by a City Council which was unconstitutionally apportioned, so that plaintiff's ultimate vote through his designated representatives in the City Council did not receive its proper weight. In other words, plaintiff contends that he has a constitutional right through his designated representatives to participate in any redistricting plan which the City Council may propose to the voters of Baltimore City by way of Charter amendment on an equal basis with other citizens and voters, and this right is violated when a redistricting plan is submitted to the voters by an unconstitutionally apportioned City Council. Thus, plaintiff argues that the City Council must be first reapportioned in such manner as to meet the requirements of the Equal Protection Clause as a condition precedent to its valid adoption of any proposal for redistricting.

Assuming that he prevails in his first contention, but his second contention is found to lack merit, plaintiff thirdly argues that Modified Plan X is invalid. This third contention is three-fold in nature. Like one of the facets of the first contention, plaintiff argues, again, that the formula prescribed in the amendment to Section 16 of the Charter, proposed by Modified Plan X, is unconstitutional on its face because of what might happen under

registered. The number of members to be elected from each District shall be determined as follows: *three members for each District in which there were not more than 70,000 voters at the close of office hours of the Board of Supervisors of Elections of Baltimore City on the first Monday in December prior to the election; four members for each District having more than 70,000 such voters.* (emphasis supplied)

"The determination of the number of registered voters in each District, shall be made by the Board of Supervisors of Election of Baltimore City and an appropriate certificate with respect thereto shall be filed by said Board with the Mayor and with the President of the City Council not later than the Friday following the first Monday in December prior to the date on which members of the City Council are to be elected."

7. "20. CITY COUNCIL—*Councilmanic Districts.* The Councilmanic Districts as described and laid out in the book deposited with the Clerk of the Superior Court of Baltimore City January 22, 1923, and recorded in Liber S. C. L. No. 3959, folio 1, shall be and hereafter remain the several Councilmanic Districts of Baltimore City until changed by law or pursuant to the provisions of Section 16."

The reference to § 16 contained in § 20 is an inadvertent one, and was not removed when § 20 as originally drafted was amended, during the course of passage of the Charter of 1949.

this formula, namely, that a district having a few inhabitants and fewer registered voters can never elect less than three representatives to the City Council, while a district having any number of inhabitants and registered voters in excess of 70,000 can never elect more than four members of the City Council. As a second subsidiary contention, plaintiff argues that, as related to the present distribution of inhabitants and registered voters among the several councilmanic districts of Baltimore City, Modified Plan X, if put into effect, would result in malapportionment of the City Council such as to violate the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States. As a third subsidiary contention, plaintiff argues that, if otherwise valid, Modified Plan X results in a denial of equal protection because it unduly postpones its corrective action. In other words, plaintiff argues that Modified Plan X if adopted by the voters at the forthcoming general election should go into effect immediately thereafter and a special councilmanic election should be held no later than May, 1965 to reconstitute the City Council on a constitutional basis.

I

■■ There can be no question but that plaintiff's first contention is meritorious when the application of the provisions of Section 16 to present distribution of citizens and registered voters among the several councilmanic districts is considered. At the outset, it should be noted that, unlike the provisions of Article III, § 2 of the Maryland Constitution relating to apportionment of the House of Delegates of the General Assembly of Maryland for Baltimore City, which requires apportionment on the basis of "equal population," Section 16 of the Baltimore City Charter requires apportionment on the basis of registered voters. For the reasons hereafter stated, we conclude that the Equal Protection Clause of the Constitution of the United States requires that the validity of any apportionment be tested on the basis of population, rather than on the basis of registered voters; but, by either test, Section 16 fails to meet the requirements of equal protection. This conclusion results from a consideration of the following facts:

The stipulations of the parties show that the average representation of constituents by councilmen is:

| District | Population (1960 U.S. Census) | Number of Councilmen | Representation |
|---|---|---|---|
| First | 94,761 | 3 | 31,587 |
| Second | 84,213 | 3 | 28,071 |
| Third | 278,759 | 4 | 69,690 |
| Fourth | 118,339 | 3 | 39,446 |
| Fifth | 223,417 | 4 | 55,854 |
| Sixth | 139,535 | 3 | 46,511 |

A vote in the second district is worth more than twice a vote in the third district, and almost twice a vote in the fifth district. A vote in the first district is worth more than twice a vote in the third district and more than one and three-quarters times a vote in the fifth district. In combination the voters in the first, second, fourth and sixth councilmanic districts can elect twelve councilmen. Such a combination would represent only 46.5% of the total population of the city.

When viewed from the standpoint of voter registration, the inequities of present apportionment are even more startling. The stipulations further show that voter registration in each of the councilmanic districts, as of July, 1964, when re-

950

lated to the number of councilmen elected from each district, results in an average representation by each councilman as shown below:

| District | Voter Registration | Number of Councilmen | Representation |
|---|---|---|---|
| First | 34,710 | 3 | 11,570 |
| Second | 25,758 | 3 | 8,586 |
| Third | 116,476 | 4 | 29,119 |
| Fourth | 40,958 | 3 | 13,653 |
| Fifth | 97,784 | 4 | 24,446 |
| Sixth | 41,126 | 3 | 13,709 |

Thus, the voters in the first, second, fourth and sixth councilmanic districts can elect a majority of the members of the council under the existing scheme of apportionment. Stated statistically, 40% of the registered voters of Baltimore City can elect twelve of the twenty councilmen.

A vote in the second councilmanic district is worth over three times as much as a vote in the third councilmanic district. While this is the most inequitable of the comparisons to be drawn between the districts, the other disparities are not less significant. A vote in the second councilmanic district is worth almost three times a vote in the fifth councilmanic district, and votes in the first, fourth and sixth councilmanic districts are worth approximately twice a vote in the fifth councilmanic district.

Manifestly, plaintiff's right to equal protection of the laws in his representation in the City Council is being pres-

ently denied, Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); WMCA Inc. v. Lomenzo, 377 U.S. 633, 84 S.Ct. 1418, 12 L.Ed.2d 568 (1964); Maryland Committee for Fair Representation v. Tawes, 377 U.S. 656, 84 S.Ct. 1429, 12 L.Ed.2d 595 (1964); Davis v. Mann, 377 U.S. 678, 84 S.Ct. 1441, 12 L.Ed.2d 609 (1964); Roman v. Sincock, 377 U.S. 695, 84 S.Ct. 1449, 12 L.Ed.2d 620 (1964); Lucas v. Colorado General Assembly, 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964).

From what has been said, it becomes unnecessary to decide plaintiff's subsidiary contention that Section 16 of the Baltimore City Charter is invalid on its face because of what might possibly happen in the application of the formula established therein. The fact is that plaintiff's fears have been realized. In passing we note that this result would have been mitigated had the proposal of the Charter Revision Commission of 1945 been adopted.[8]

8. In its report, dated November 14, 1945, the Charter Revision Commission made the following comment, pp. xvii–xviii: "At present each Councilmanic District elects three Councilmen, regardless of the population of the District. For example, in 1943 there were 41,492 registered voters in the Second District and 88,645 such voters in the Third District; or, stated another way there were 13,831 voters per Councilman in the Second District as compared with 29,548 voters per Councilman in the Third District. To further illustrate from the 1943 election, all defeated candidates in each of the Third and Fifth Districts received more votes than all elected candidates in each of the First, Second, Fourth and Sixth Districts. Such a situation requires correction; it is un-American and illogical. An apparent remedy would be to elect the Councilmen at large, but there are strong objections to this: (a) unless the membership were drastically reduced, the number of candidates appearing on the voting machine or ballot becomes unwieldy, (b) there is a strong tradition in the City in favor of the District system. Nor does it seem advisable to attempt correction by re-districting the City, since that would be only a temporary remedy as shifts of population occur in the several Districts. It has been noted that in 1943 each Councilman represented an average of 20,231 voters. As a practical solution of his problem, the amendment (Sec. 16) provides that each District shall have a minimum of

## II

The Court concludes that plaintiff's second contention is lacking in merit. A contention precisely in the terms urged by plaintiff has not been passed on in any of the group of election cases above cited, decided by the Supreme Court on June 15, 1964. Yet, it is believed that those cases, if not expressly nevertheless impliedly, reject the contention. In each of the cases invidious malapportionment was found to exist. In the Reynolds case the Court approved a temporary or interim reapportionment of the Alabama Legislature by the district court, so that the stranglehold of the rural legislative units on the General Assembly could be broken and a climate created in which it could be hoped that a permanent and fairer apportionment scheme could be formulated. Implicit in the opinion in the case is the premise that the district court's reapportionment was not a final solution to the problem, and the Court was careful to indicate that "* * * reapportionment is primarily a matter for legislative consideration and determination, * * *" and that the lower court was correct "* * * in prescribing a plan admittedly provisional in purpose so as not to usurp the primary responsibility for reapportionment which rests with the legislature" (377 U.S. 586, 84 S.Ct. 1394, 12 L.Ed.2d 541).

More apposite is the WMCA case, where the Court found that both houses of the New York Legislature were unconstitutionally apportioned. While the Court remanded the case to the district court for further proceedings and, hence, did not prescribe a form of final decree, the Court did state that the district court, acting under equitable principles could determine whether, because of the imminence of an election in November, 1964 the election should go forward, even on the basis of unconstitutional apportionment, in order to give the New York Legislature an opportunity to fashion a constitutionally valid legislative apportionment plan, or whether some proper relief effective before that election should be fashioned (377 U.S. 655, 84 S.Ct. 1429, 12 L.Ed.2d 581).

In the Maryland Committee case both houses of the Maryland General Assembly were found to be unconstitutionally apportioned. These members were elected in 1962 and would serve until 1966. On these facts, the Court stated (377 U.S. 675–676, 84 S.Ct. 1452–1453, 12 L.Ed.2d 607–608):

"* * * With the Maryland constitutional provisions relating to legislative apportionment hereby held unconstitutional, the Maryland Legislature presumably has the inherent power to enact at least temporary reapportionment legislation pending adoption of state constitutional provisions relating to legislative apportionment which comport with federal constitutional requirements.

two Councilmen (instead of three as at present) but if a District has more than 50,000 and not more than 75,000 registered voters then such District will elect three Councilmen; if such District has more than 75,000 but less than 100,-000 registered voters, such District will elect four Councilmen; and if more than 100,000 voters, then such District shall be divided into two Districts by ordinance, or, if the Council fails to pass such ordinance, then by the Supervisors of Elections. *By this plan each Councilman in the smallest District (1943 figures) would represent approximately 20,000 voters and in the largest 22,000 voters; in the future, at most 25,000 voters. While the proposal does not provide full equality of representation, it ap-*

*proximates that goal and has the added advantages of not interfering unduly with traditional practice and of providing for adjustments in the future without further amendment.* Representation based upon registered voters rather than population has been adopted for the very practical reason that under our system of permanent registration the number of registered voters as of any given date can be readily determined, whereas a census is taken only at long intervals, with interim approximations." (emphasis supplied)

However, in submitting the New Charter to the voters the City Council amended this proposal, and adopted the formula in present Section 16. See footnote 5, supra.

"Since primary responsibility for legislative apportionment rests with the legislature itself and since adequate time exists in which the Maryland General Assembly can act, the Maryland courts need feel obliged to take further affirmative action only if the legislature fails to enact a constitutionally valid state legislative apportionment scheme in a timely fashion after being afforded a further opportunity by the courts to do so. However, under no circumstances should the 1966 election of members of the Maryland Legislature be permitted to be conducted pursuant to the existing or any other unconstitutional plan. * * * "

To these should be added references to the Davis case where, having found the Virginia Legislature to be unconstitutionally apportioned, the Court remarked that the next election of Virginia legislators would not occur until 1965, thus giving the Virginia Legislature " * * * ample time * * * to enact a constitutionally valid reapportionment scheme for purposes of that election" (377 U.S. 693, 84 S.Ct. 1461, 12 L.Ed.2d 618) ; and to the Roman case, where, having found the Delaware Legislature to be unconstitutionally apportioned, the Court, in remanding the case to the district court, stated that the latter must determine whether to permit the 1964 election of Delaware legislators to be conducted pursuant to the invalid apportionment scheme so as to permit the new legislature to adopt a constitutionally valid apportionment scheme or to grant some other immediate interim relief.

Malapportionment may be corrected in one of four ways: First, by requiring candidates to run at large within the overall legislative unit in which they participate as representatives. Malapportionment may also be corrected by strict reapportionment, that is to say, by reassigning an established aggregate number of representatives to various existing election units, with or without an increase or decrease in the aggregate number of representatives. A third corrective solution is strict redistricting, that is to say, redefinition of election districts within a political unit, so as to bring about an equality of vote between the inhabitants of the district and the previously assigned number of representatives from that district. The fourth method of correcting malapportionment is a combination of the second and third methods, and it is the fourth method which the Resolution proposes, because it proposes a redefinition of councilmanic districts within the City of Baltimore, and it proposes a restating of the formula by which councilmen are assigned to the councilmanic districts.

The constitutional rights of a voter suffering from malapportionment to be properly represented in any legislative scheme to effect constitutional apportionment do not differ, whatever the method by which unconstitutional apportionment is corrected. The teaching of the Reynolds, WMCA, Maryland Committee, Davis and Roman cases, supra, is that the validity of the solution depends upon the end result and not the means by which that solution is achieved and, further, that reapportionment is the responsibility primarily of the legislative body which is presently malapportioned and not the courts. Implicit in these cases is recognition that the rights of a citizen and voter suffering from unconstitutional malapportionment are fully served if a plan of valid apportionment is achieved, but that he has no right to the end result as a prerequisite to achieving the end result. Plaintiff argues that his rights are greater where malapportionment is sought to be corrected by redistricting than by strict reapportionment, but he cites no authority in support of his position, the Court has found none, and the Court construes the cases to which reference has been made to require only a proper end result.[9]

9. It is not without significance that during argument at the first hearing, counsel for plaintiff was asked how the present City Council should be reapportioned. Assuming retention of present councilmanic districts and the present number

## III

Having concluded that the present City Council is unconstitutionally apportioned, but that no rights of the plaintiff are denied if the Council proposes to the voters of Baltimore City a constitutionally proper scheme of apportionment, we next consider whether Modified Plan X accomplishes this result. Logically, the first step is to determine whether the validity of Modified Plan X is to be tested by its impact on the population of Baltimore City, or upon the distribution of registered voters of Baltimore City, or both.[10] Having decided that the Equal Protection Clause requires that the validity of Modified Plan X be tested on the basis of population, we state our reasons for this conclusion:

To urge a contrary conclusion, defendants contend that the concept of "one person, one vote" implicitly means that the validity of apportionment is related to voters and not constituents. Reference is made to isolated phrases throughout Reynolds v. Sims, supra, and companion cases, where the Supreme Court discussed statistics relating to registered voters and referred to "voters" sometimes even interchangeably with "population" as lending support to the asserted construction of "one person, one vote." Nevertheless, a careful reading of Reynolds v. Sims, and particularly its analysis of the foundation for the "one person, one vote" concept, makes clear that the basic constitutional protection is one of equal representation by population, and not equal representation by registered voters.

"One person, one vote" had its genesis in Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963), and Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964). Specifically, Gray v. Sanders, in holding that the Georgia County Unit System applicable in statewide primary elections was unconstitutional since it resulted in a dilution of the weight of the votes of certain Georgia voters merely because of where they resided, announced "one person, one vote;" and Wesberry v. Sanders, which concerned an attack on congressional districting, examined the historical context of the constitutional requirement that members of the House of Representatives be elected "by the people." In Wesberry it was held that " * * * as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's," 376 U.S. 7–8, 84 S.Ct. 530, but then pointed out that the way this objective was to be accomplished was to draw congressional districts in such a way that there shall be equal representation for equal numbers of people.

In Reynolds v. Sims the Court engrafted the rule of these cases into the apportionment of a state legislative body, saying (377 U.S. 560–561, 84 S.Ct. 1381, 12 L.Ed.2d 526–527):

"Gray, though not determinative here since involving the weighting of votes in statewide elections, estab-

---

of twenty councilmen, counsel was unable to suggest a plan giving substantial equality of representation by population or by registered voters.

10. The Bard Commission which formulated its recommendations prior to the decision in Reynolds v. Sims, supra, and related cases advocated perpetuating the voter registration requirements of Section 16 of the Baltimore City Charter, and its recommendation in this regard was adopted in the Resolution. At the same time, the Bard Commission sought to redefine councilmanic districts in a manner acceptable to the General Assembly which is required by the Maryland Constitution. Article III, § 2 to divide Baltimore City into the legislative districts on the basis of equal population, so that the boundaries of councilmanic and legislative districts would coincide. This goal was not achieved, because the General Assembly, in enacting Chapter 1 of the Acts of the General Assembly of Maryland (Special Session, March 11, 1964) prescribed legislative districts different from the councilmanic districts proposed by the Resolution, although Dr. Bard testified that the correlation is good enough that we would accept it as being valuable within our frame of reference. The General Assembly may well wish to re-examine Chapter 1 as part of the overall reapportionment required by Maryland Committee v. Tawes, supra.

lished the basic principle of equality among voters within a State, and held that voters cannot be classified, constitutionally, on the basis of where they live, at least with respect to voting in statewide elections. And our decision in Wesberry was of course grounded on that language of the Constitution which prescribes that members of the Federal House of Representatives are to be chosen 'by the People,' while attacks on state legislative apportionment schemes, such as that involved in the instant cases, are principally based on the Equal Protection Clause of the Fourteenth Amendment. Nevertheless, Wesberry clearly established that the fundamental principle of representative government in this country is one of equal representation for equal numbers of people, without regard to race, sex, economic status, or place of residence within a State. Our problem, then, is to ascertain, in the instant cases, whether there are any constitutionally cognizable principles which would justify departures from the basic standard of equality among voters in the apportionment of seats in state legislatures."

What was meant by this quoted passage is made abundantly clear by an additional discussion as follows (377 U.S. 567–568, 84 S.Ct. 1384–1385, 12 L.Ed.2d 530–531):

"Population is, of necessity, the starting point for consideration and the controlling criterion for judgment in legislative apportionment controversies. A citizen, a qualified voter, is no more nor no less so because he lives in the city or on the farm. This is the clear and strong command of our Constitution's Equal Protection Clause. This is an essential part of the concept of a government of laws and not men. This is at the heart of Lincoln's vision of 'government of the people, by the people, [and] for the people.' The Equal Protection Clause demands no less than substantially equal state legislative representation for all citizens, of all places as well as of all races."

Defendants rely heavily on language appearing later in the opinion in Reynolds v. Sims as lending support to their argument that registered voters are a constitutionally valid criterion in fixing apportionment. To understand fully what the Court was saying, it is necessary to quote at length from its opinion (eliminating footnotes). There, at 377 U.S. 579–581, 84 S.Ct. 1390, 1391, 1392, 12 L.Ed.2d 537–539, it was said:

"History indicates, however, that many States have deviated, to a greater or lesser degree, from the equal-population principle in the apportionment of seats in at least one house of their legislatures. So long as the divergences from a strict population standard are based on legitimate considerations incident to the effectuation of a rational state policy, *some deviations from the equal-population principle are constitutionally permissible with respect to the apportionment of seats in either or both of the two houses of a bicameral state legislature.* But neither history alone, nor economic or other sorts of group interests, are permissible factors in attempting to justify disparities from population-based representation. Citizens, not history or economic interests, cast votes. Considerations of area alone provide an insufficient justification for deviations from the equal-population principle. Again, people, not land or trees or pastures, vote. Modern developments and improvements in transportation and communications make rather hollow, in the mid-1960's, most claims that deviations from population-based representation can validly be based solely on geographical considerations. Arguments for allowing such deviations in order to insure effective representation for sparsely settled areas and to prevent legislative districts from becoming so large that the availability

of access of citizens to their representatives is impaired are today, for the most part, unconvincing.

"A consideration that appears to be of more substance in justifying some deviations from population-based representation in state legislatures is that of insuring some voice to political subdivisions, as political subdivisions. Several factors make more than insubstantial claims that a State can rationally consider according political subdivisions some independent representation in at least one body of the state legislature, as long as the basic standard of equality of population among districts is maintained. Local governmental entities are frequently charged with various responsibilities incident to the operation of state government. In many States much of the legislature's activity involves the enactment of so-called local legislation, directed only to the concerns of particular political subdivisions. And a State may legitimately desire to construct districts along political subdivision lines to deter the possibilities of gerrymandering. *However, permitting deviations from population-based representation does not mean that each local governmental unit or political subdivision can be given separate representation, regardless of population. Carried too far, a scheme of giving at least one seat in one house to each political subdivision (for example, to each county) could easily result, in many States, in a total subversion of the equal-population principle in that legislative body.* This would be especially true in a State where the number of counties is large and many of them are sparsely populated, and the number of seats in the legislative body being apportioned does not significantly exceed the number of counties. Such a result, we conclude, would be constitutionally impermissible. And careful judicial scrutiny must of course be given, in evaluating state apportionment schemes, to the character as well as the degree of deviations from a strict population basis. *But if, even as a result of a clearly rational state policy of according some legislative representation to political subdivisions, population is submerged as the controlling consideration in the apportionment of seats in the particular legislative body, then the right of all of the State's citizens to cast an effective and adequately weighted vote would be unconstitutionally impaired.*" (emphasis supplied)

This passage does not support defendant's argument. Although we recognize that in certain cases there may be some basis for deviation from mathematically equal apportionment without Equal Protection Clause infraction, population cannot be submerged as the basic, primary and controlling test of valid apportionment. The exception, discussed by the Supreme Court in the foregoing quotation, on its face, has principal application to a bicameral legislative body; the City Council of Baltimore is a unicameral body. Moreover, there is nothing before us to show that Baltimore City is so heterogeneous or so widely dispersed that its political subdivisions have any claim to representation in the City Council as political subdivisions. Indeed, the Resolution redefines the political subdivisions of Baltimore City so that they come before us lacking any historical sanctity.

Our view of the proper construction of the Reynolds case is reinforced by the fact that Reynolds v. Sims was decided the same day as five other apportionment cases, and thus the Supreme Court had an immediate opportunity to distill its holding in Reynolds v. Sims. Significantly, in the WMCA case, supra, it described its holding as (377 U.S. 653, 84 S.Ct. 1428, 12 L.Ed.2d 580):

"In Reynolds v. Sims, 377 U.S. [ante, p. 533], 84 S.Ct. 1632 [12 L.Ed.2d 506], decided also this date, we held that the Equal Protection Clause requires that seats in both houses of a bicameral state legislature must be

apportioned substantially on a population basis."

and repeated this precise language in each of the other four cases. See, Maryland Committee for Fair Representation v. Tawes, supra, 377 U.S. 674, 84 S.Ct. 1438, 12 L.Ed.2d 606; Davis v. Mann, supra, 377 U.S. 690, 84 S.Ct. 1448, 12 L.Ed. 2d 617; Roman v. Sincock, supra, 377 U.S. 708, 84 S.Ct. 1456, 12 L.Ed.2d 629; Lucas v. Colorado General Assembly, supra, 377 U.S. 734, 84 S.Ct. 1472, 12 L.Ed. 2d 646.

We, thus, consider the effect of Modified Plan X by population. The stipulated statistics show:

### MODIFIED PLAN X—POPULATION

| District | Population (1960 Census) | Number of Councilmen | Residents per Councilman |
|---|---|---|---|
| First | 103,102 | 3 | 34,367 |
| Second | 170,789 | 3 | 56,930 |
| Third | 183,425 | 4 | 45,856 |
| Fourth | 166,263 | 3 | 55,421 |
| Fifth | 162,644 | 4 | 40,661 |
| Sixth | 152,801 | 3 | 50,934 |
| | 939,024 | 20 | |

City-wide average representation per councilman—46,951

| District | Residents per Councilman | Numerical Disparity | Percentage Disparity |
|---|---|---|---|
| First | 34,367 | − 12,584 | − 27% |
| Second | 56,930 | + 9,979 | + 21% |
| Third | 45,856 | − 1,095 | − 2% |
| Fourth | 55,421 | + 8,470 | + 18% |
| Fifth | 40,661 | − 6,290 | − 13% |
| Sixth | 50,934 | + 3,983 | + 8% |

While we have no doubt that the statistics by population are our primary concern, the statistics by voter registration are set forth in the margin.[11]

11.
### MODIFIED PLAN X—VOTER REGISTRATION

| District | Registered Voters | Number of Councilmen | Registered Voters per Councilman |
|---|---|---|---|
| First | 37,110 | 3 | 12,370 |
| Second | 56,416 | 3 | 18,805 |
| Third | 84,771 | 4 | 21,193 |
| Fourth | 59,750 | 3 | 19,917 |
| Fifth | 73,728 | 4 | 18,432 |
| Sixth | 45,038 | 3 | 15,013 |
| | 356,813 | 20 | |

Registered Voters per Councilman—City-wide average—17,841

| District | Registered Voters per Councilman | Numerical Disparity | Percentage Disparity |
|---|---|---|---|
| First | 12,370 | − 5,471 | − 31% |
| Second | 18,805 | + 964 | + 5% |
| Third | 21,193 | + 3,352 | + 19% |
| Fourth | 19,917 | + 2,076 | + 12% |
| Fifth | 18,432 | + 591 | + 3% |
| Sixth | 15,013 | − 2,828 | − 15% |

As a new plan of apportionment, designed to eliminate inequities in present apportionment, Modified Plan X assigns one more councilman to the fifth councilmanic district than to the fourth, notwithstanding that the fifth councilmanic district has almost 4,000 fewer inhabitants than the fourth councilmanic district. Modified Plan X also results in a weighting of votes between the first and second councilmanic districts so that a vote in the first councilmanic district is worth 1.66 times a vote in the second councilmanic district. Under Modified Plan X the voters of the first, third and fifth councilmanic districts—in which live 48% of the total population of the city—can elect an absolute majority of the City Council.[12]

To determine the validity of Modified Plan X, we cannot rest on the recent published thinking of political scientists expressing approbation of variations from exact statistical averages no greater than those shown in this case,[13] nor can we attach significance to the direction of the Supreme Court in Lucas v. Colorado General Assembly, supra, that a ratio of 1.7 to 1 be reconsidered on the question of severability. Similarly, state decisions collected and tabulated in Goldberg, The Statistics of Malapportionment, 72 Yale L.J. 90, which show lesser disparities from mathematical equality, which have been condemned under the provisions of state law, provide us with no precedent.

These conclusions follow because of the holdings of the Supreme Court in Roman v. Sincock, supra, viewed in the light of the disposition of that case by the lower court. In the lower court opinion in Roman v. Sincock, it was suggested that ratios of disparity no greater than 1.5 to 1 would survive constitutional attack, while those larger would be too extreme to be sustainable. Sincock v. Duffy, 215 F.Supp. 169, 190 (D.C.Del.1963). The Supreme Court rejected this test and set forth the proper approach we must follow when it said (377 U.S. 710, 84 S.Ct. 1470, 12 L.Ed.2d 629–630, footnote eliminated):

> "Our affirmance of the decision below is not meant to indicate approval of the District Court's attempt to state in mathematical language the constitutionally permissible bounds of discretion in deviating from apportionment according to population. In our view the problem does not lend itself to any such uniform formula, and it is neither practicable nor desirable to establish rigid mathematical standards for evaluating the constitutional validity of a state legislative apportionment scheme under the Equal Protection Clause. *Rather, the proper judicial approach is to ascertain whether, under the particular circumstances existing in the individual State whose legislative apportionment is at issue, there has been a faithful adherence to a plan of population-based representation, with such minor deviations only as may occur in recognizing certain factors that are free from any taint of arbitrariness or discrimination."*
> (emphasis supplied)

Any inferences we might draw from the fact that distribution of our order for rehearing of this case, and publicity attendant thereon, brought forth no one to support plaintiff's advocacy, and only one person and one group expressing

---

12. Like observations may be made with respect to the effect of Modified Plan X from the standpoint of registered voters. Less than 44% of the registered voters, i. e., those residing in the first, fifth and sixth councilmanic districts, can elect ten councilmen who, with the vote of the President, who is elected at large, can control the Council. A vote in the first councilmanic district is worth 1.71 times a vote in the third councilmanic district.

13. Baker, State Constitutions; Reapportionment (National Municipal League, 1960 Ed.), p. 28; Jewell, The Politics of Reapportionment (Atherton Press, 1962 Ed.), p. 281; Wheeler, Salient Issues of Constitutional Revision (National Municipal League, 1961 Ed.), p. 44.

qualified approval of Modified Plan X, are also without legal significance, because even if Modified Plan X were approved by the voters of Baltimore City, their approval of the disparities we have noted, standing alone, would not validate them, Lucas v. Colorado General Assembly, supra, 377 U.S. 736–737, 84 S.Ct. 1473, 12 L.Ed.2d 647.

Applying the test established in Roman v. Sincock, supra, we do not believe that Modified Plan X has been shown to comport with the Equal Protection Clause. For a new plan of reapportionment designed to eliminate existing inequities, we cannot approve assigning four councilmen to the fifth councilmanic district and three councilmen to the fourth councilmanic district, when the fifth councilmanic district has almost 4,000 fewer inhabitants than the fourth. Even if we accept Dr. Bard's testimony that there is a younger population in the fourth councilmanic district than any other district, with a correspondingly larger percentage of inhabitants reaching voter age, and a heavier than average percentage of voter registration to population,[14] so that the fourth councilmanic district would likely be entitled to a fourth councilman by the time of the first election under Modified Plan X, we cannot approve the disparity in the weight of votes between the first and second councilmanic districts. As to these two districts no proof of any special considerations has been offered, nor are there any special considerations of which we can take judicial notice, which would provide a rational explanation of the disparity which we find or which would justify such a degree of discrimination.

We know as a matter of historical fact that the reapportionment proposed by the Resolution was based primarily upon consideration of the distribution of registered voters. Consideration of registered voters is not improper if a valid result based upon population is reached, but encouragement of voter registration, although a worthy political and social objective, is not sufficient to support a weighting of votes in the ratio of 1.66 to 1, where the percentage of registration to population is approximately 36% in the first councilmanic district and approximately 33% in the second. If we assume that there is a constant correlation between population and registered voters,[15] a formula assigning councilmen on the basis of registered voters has the advantage of greater response to rapid changes in population shifts. But, where the formula gives a choice only between no less than three councilmen nor more than four, it lacks flexibility and it can, within a relatively short time, lead to grosser disproportions than we find here. A plan of reapportionment which begins with the inequities that we have noted, and which has this inherent limitation, can offer only limited promise of a better life to come, particularly when by its terms it lacks any mandatory reappraisal of the distribution of population on a periodic basis. For these reasons, we conclude that Modified Plan X would result in constitutionally invalid discrimination.

In reaching this conclusion we stress what we do not decide. We do not decide that absolute mathematical equality under all circumstances is required, nor do we decide what should be the size of the City Council, or the boundaries of councilmanic districts. We do not decide whether councilmen should be elected by district, or at large and, if by district, the formula by which councilmen should be apportioned to the various election dis-

14. While the percentage of voter registration to population may be heavier than *average* in the fourth councilmanic district the fifth and sixth councilmanic districts have still heavier percentages. See footnote 15, infra.

15. In a statement to the City Council, Dr. Bard reported that in the sixth council-

manic district 30% of the total population are registered voters, in the second councilmanic district 36%, in the fourth councilmanic district 38%, in the fifth councilmanic district 46%, and in the third councilmanic district 51%.

tricts. These are matters peculiarly for the consideration of the legislative body and the inhabitants of the City of Baltimore, and ones that we should undertake to decide only if there is a failure of the City Council to carry out its duty validly to reapportion itself.

### RELIEF

■ From what we have said it necessarily follows that the Mayor and City Council of Baltimore should be enjoined now from conducting any further municipal elections pursuant to the provisions of the Baltimore City Charter which we have found to be invalid. We take note that Sections 16 and 20 of the present Charter are to be submitted to the voters of Baltimore City for readoption at the election to be held November 3, 1964 by Resolution No. 1 of the Mayor and City Council of Baltimore, approved July 2, 1964. This Resolution is a restatement of the Charter in its entirety and embodies numerous changes proposed by the Charter Revision Commission of Baltimore City of 1964. But the only effect on Sections 16 and 20 is to renumber them as Sections 2 and 7, respectively, of Article III of the proposed new City Charter. Unlike Lucas v. Colorado General Assembly, supra (see also, Maryland Committee v. Tawes, supra), we have no problem of the severability of the enactment of Sec-

tions 16 and 20 from the other changes, proposed by Resolution No. 1, because that Commission has stated that the changes it proposes are submitted to the voters of Baltimore City irrespective of reapportionment of the City Council.[16] It is unnecessary, therefore, to enjoin Resolution No. 1 as such, but our decree, in enjoining any election under Sections 16 and 20, will prohibit the holding of any elections under any repeal and reenactment of the same.

It also follows that we should enjoin the submission of Resolution No. 9 to the voters at the November 3, 1964 election.

We will not undertake a valid reapportionment of the City Council of Baltimore at this time. Under the existing Charter, municipal elections will not again occur until May, 1967. If Resolution No. 1 is adopted, municipal elections will not occur until November, 1967. A general election will be held in November, 1966. There is, therefore, ample time for the City Council to propose a valid scheme of reapportionment and submit it to the voters for adoption before the next municipal election will be held. We will, however, retain jurisdiction of the case pending the adoption and approval by the voters of a valid scheme of reapportionment of the City Council.

Counsel shall submit a form of decree in five days.

16. The Report of the Charter Commission of Baltimore City, dated April 6, 1964, pp. 6-7, reads:
"A matter of considerable interest to which we devoted much time is the proper composition of the City Council. Substantial reasons have been presented to us to support the inclusion of some members elected for the City as a whole and not simply for particular districts. However, *the whole subject of redistricting is itself at present being considered by the City Council and we feel that under the circumstances it would unduly complicate the situation to propose at-large representation. The matter should be reconsidered as a separate issue when the question of redistricting has been finally resolved.* At present, the City Council has adopted a resolution for consideration by the voters at the election on November 3, 1964, proposing one plan of redistricting. However, the State Legislature has adopted another redistricting plan applicable to the election of representatives to the General Assembly. The City Council may prefer a councilmanic redistricting which would coincide with the legislative redistricting adopted by the General Assembly. If so, it may accomplish such a result by adding such a redistricting plan to the language of the general Charter amendment which we are proposing. If not, our proposed amended Charter has been framed in such language that, if the voters accept the redistricting resolution now outstanding, its substance will be incorporated into the amended Charter." (emphasis supplied).