**Andrew KAPRAL et al., Plaintiffs,**

v.

**Alan H. JEPSON et al., Defendants.**

**Civ. No. 11470.**

United States District Court
D. Connecticut.

May 31, 1967.

Robert I. Berdon and David D. Berdon, of Berdon, Berdon & Young, New Haven, Conn., for plaintiffs.

Stephen I. Traub, of Lynch & Traub, New Haven, Conn., and Dennis F. Harrigan, Milford, Conn., for defendants.

TIMBERS, Chief Judge.

## QUESTIONS PRESENTED

Plaintifffs' motion for partial summary judgment, pursuant to Rule 56, Fed.R.Civ.P., in this action seeking declaratory and injunctive relief with respect to the districting of the Board of Aldermen of the City of Milford, presents essentially the following questions:

(1) Whether the admitted disproportion in population between the five voting districts of the City of Milford on the basis of which aldermen are elected to the legislative body of that City presents a justiciable controversy between the parties over which this Court has jurisdiction.

(2) Whether the districting of the Board of Aldermen of the City of Milford as now constituted so debases the voting rights of plaintiffs in their choice of members of the Board of Aldermen as to result in an invidious discrimination against plaintiffs who thereby are denied the equal protection of the laws guaranteed by the Fourteenth Amendment of the United States Constitution.

(3) Whether, by consent of the parties, a Special Master should be appointed by the Court to formulate a plan for temporary constitutional redistricting of the Board of Aldermen pending adoption, by ordinance or amendment of the Charter of the City of Milford or otherwise, of an appropriate redistricting of the Board of Aldermen which shall comport with federal constitutional requirements.

The Court holds that each of the foregoing questions should be answered in the affirmative; but with respect to question (3), it does so with reluctance.

The material facts, as well as the conclusions of law, necessary to a determination of the instant motion for summary judgment are not in dispute. The Court, accordingly, makes the following findings of fact and conclusions of law pursuant to Rule 52, Fed.R.Civ.P.

## FINDINGS OF FACT

1. Plaintiffs, suing for themselves and other Milford voters similarly situated, are, and at least since November 1, 1965 have been, residents and qualified voters in the City of Milford, and more particularly are residents and qualified voters in the following aldermanic voting districts of the City of Milford:

(a) Andrew Kapral and Samuel Kapral in the Third District.

(b) Joseph Ribon in the Fourth District.

2. Defendants are elected officials of the City of Milford, as follows:

(a) Alan H. Jepson, Mayor of the City of Milford.

(b) Margaret S. Egan, City and Town Clerk of the City of Milford.

(c) John R. LeGeyt, Chairman of the Board of Aldermen of the City of Milford, the legislative body of that City.

(d) Members of the Board of Aldermen.

Defendants are sued in their official capacities and particularly with respect to their duties relating to the holding of elections to the Board of Aldermen, certifying the results of such elections, altering by ordinance the boundaries of voting districts and holding office under the Charter of the City of Milford.

3. The City of Milford, although not a party to this action,[1] is a municipal corporation and a political subdivision of the State of Connecticut. It is governed by the General Statutes of the State of Connecticut and by Special Act No. 139, enacted by the Connecticut General Assembly in 1959 and entitled "An Act Concerning A Charter For The City of Milford," (hereinafter the "Charter"), revised effective January 1, 1964 pursuant to the Home Rule Act.

Conn. Gen. Stat. § 7–187, et seq. (1958), as amended, (Supp.1966).

4. The Court takes judicial notice of all provisions of the Charter which govern the election of members of the Board of Aldermen, including the following:

*Article II, Section 4*

"The provisions of the general statutes relating to town elections shall govern the conduct of all elections held under the provisions of this act except as otherwise provided herein. At all elections held within the city, there shall be not fewer than five voting districts, with a polling place located in each district, containing as nearly as possible an equal number of electors. The board of aldermen at any time may, by ordinance, alter the boundaries of said districts or establish additional districts."

*Article II, Section 3*

". . . (n)ot more than two members of the board of aldermen elected from each voting distict, . . . may be members of the same political party at any time."

*Article III, Section 3*

"The board of aldermen shall consist of three members from each voting district."

5. The Court takes judicial notice of all provisions of the General Statutes and of the Charter which vest legislative powers in the Board of Aldermen, including the provisions of Article III, Section 6, of the Charter.

6. By ordinance adopted by the Board of Aldermen, the City of Milford is presently divided into five voting districts the territorial boundaries of which are more particularly described in Section 2–1 of the Code of the City of Milford. From each of these five voting districts, three aldermen are elected to a Board of fifteen.

---

1. The municipality itself would not be a proper party to this action any more than the state or towns would have been proper parties to the Connecticut state legislative reapportionment action. See Butterworth v. Dempsey, 229 F.Supp. 754, 798–799 (D.Conn.1964) (motion of Towns of Franklin and Salem to intervene denied), aff'd sub nom. Pinney v. Butterworth, 378 U.S. 564 (1964).

7. The boundaries of the voting districts were established many years ago, some having been established by the General Assembly in 1931.

8. Based upon the 1960 census taken by the Bureau of the Census of the United States Department of Commerce, each of the five voting districts contains the following population, agreed upon by counsel as being substantially correct:

| | | |
|---|---|---|
| First District | – | 9,305 |
| Second District | – | 6,279 |
| Third District | – | 7,593 |
| Fourth District | – | 11,374 |
| Fifth District | – | 7,111 |
| | | 41,662 |

9. The population figures of each of the five voting districts are no less disproportionate today than in 1960.

10. Based on the 1960 population of the City of Milford, the norm for each of the voting districts is 8,332. The most populous district (the Fourth with 11,-374 inhabitants) has a population of 3,042 more than the norm, indicating a deviation of 36.5% from the norm. The least populous district (the Second with 6,279 inhabitants) has a population of 2,053 less than the norm, indicating a deviation of 24.6% from the norm. The disparity between the most populous district and the least populous district is in a ratio of approximately 2:1. Even though the population figures upon which these deviations are based are figures upon which counsel have agreed as being substantially, rather than exactly, correct, the deviations from the norm are sufficiently great to obviate the necessity of having more exact population figures. A majority of the Board of Aldermen may be elected by 41.3% of the total City population.

11. No currently relevant reason is to be found in the record or is known to the Court to justify such a wide population disparity between the five voting districts.

12. Pursuant to the provisions of the Charter and the Code referred to in paragraphs 4 and 6 above, three aldermen from each of the five voting districts were elected November 2, 1965 to serve until November 13, 1967 or until their successors have qualified. The fifteen aldermen thus elected took office November 9, 1965 and are included among the defendants named herein.

13. The Court takes judicial notice that the City of Milford is a growing community as reflected in the following decennial census figures:

| Year | | Population |
|---|---|---|
| 1940 | – | 16,439 |
| 1950 | – | 26,870 |
| 1960 | – | 41,662 |

## CONCLUSIONS OF LAW

1. The complaint sets forth a justiciable controversy between the parties over which the Court has jurisdiction pursuant to 42 U.S.C. §§ 1983, 1988 and 28 U.S.C. § 1343(3) and (4).

2. Plaintiffs are persons residing in municipal legislative districts having less representation than they are entitled to, are properly representative of the class in behalf of which they sue and have standing to maintain this action.

3. Defendants are the principal persons charged with responsibilities relating to the holding of elections to the Board of Aldermen and certifying the results of such elections; and the defendant members of the Board of Aldermen have the authority under the Charter of the City of Milford to alter the boundaries of the voting districts of the City so as to permit election of members of the Board of Aldermen on a basis which will comport with federal constitutional requirements.

4. The present districting of the Board of Aldermen so debases the voting rights of plaintiffs as to result in an invidious discrimination against plaintiffs who thereby are denied the equal protection of the laws in contravention of the Fourteenth Amendment of the United States Constitution.

5. So much of Section 2–1 of the Code of the City of Milford which, in establishing boundaries for the voting districts in the City of Milford, results in a wide population disparity between the voting districts as a basis for election of members of the Board of Aldermen, being in contravention of the equal protection clause of the Fourteenth Amendment of the United States Constitution, is void and of no effect.

6. So much of Article II, Section 4, of the Charter of the City of Milford as provides that each voting district shall contain " . . . as nearly as possible an equal number of electors . . .", to the extent that said provision imposes limitations upon equality of population between the voting districts as a basis for election of members of the Board of Aldermen, being in contravention of the equal protection clause of the Fourteenth Amendment of the United States Constitution, is void and of no effect.

## OPINION

### (A) *Jurisdiction*

While the United States Supreme Court, as of the date of this opinion, has not ruled on the specific issue of whether its one man, one vote principle[2] is applicable to political subdivisions of a state,[3] including a municipal legislative body, certain lower federal courts,[4] among them the District Court for the District of Connecticut,[5] have held that such issue does present a justiciable controversy over which a federal district court has jurisdiction.

Judge Clarie's lucid and eminently sound opinion in the New Haven Board of Aldermen redistricting case[6] is the law in this District and is followed in the instant case. What Judge Clarie said on the issue of jurisdiction in *Montano* applies with equal force here:[7]

"In the profusion of cases inundating the courts since the Supreme Court decision in Baker v. Carr, 369 U.S. 186 (1962), there have been few concerned with whether the principles set forth therein are applicable to subdivisions of a state. However, admitted allegations of substantial impairment to a citizen's right to vote by virtue of a diminution of that vote through disproportionate representation presents a justiciable contro-

2. Baker v. Carr, 369 U.S. 186 (1962); Reynolds v. Sims, 377 U.S. 533 (1964); Pinney v. Butterworth, 378 U.S. 564 (1964), aff'g Butterworth v. Dempsey, 229 F.Supp. 754 (D.Conn.1964).

3. See Dusch v. Davis, 387 U.S. 112, 87 S. Ct. 1554, 18 L.Ed.2d 656 (1967), rev'g 361 F.2d 495 (4 Cir.1966) (members of city council); Sailors v. Board of Education of County of Kent, 387 U.S. 105, 87 S.Ct. 1549, 18 L.Ed.2d 650 (1967), aff'g 254 F.Supp. 17 (W.D.Mich.1966) (members of county school board). Neither of these decisions is dispositive of the specific issue presented in the instant case. The propriety of the instant case—involving charter and code provisions of local but not statewide application—being heard and decided by a single judge, rather than by a three-judge court, appears to have been settled by the Supreme Court in the Dusch case, supra. Compare Moody v. Flowers, 387 U.S. 97, 87 S.Ct. 1544, 18 L.Ed.2d 643 (1967), vacating 256 F.Supp. 195 (M.D.Ala.1966) (members of county revenue board); Board of Supervisors of Suffolk County v. Bianchi, 387 U.S. 97, 87 S.Ct. 1544, 18 L.Ed.2d 643 (1967), vacating 256 F. Supp. 617 (E.D.N.Y.1966) (members of county governing board). Three-judge courts were held to have been improperly convened in the *Moody* and *Bianchi* cases since the "statute" in each case was one of limited application, concerning only a particular county, rather than of statewide application.

4. See, e. g. Strickland v. Burns, 256 F. Supp. 824 (M.D.Tenn.1966); Delozier v. Tyrone Area School Board, 247 F. Supp. 30 (W.D.Pa.1965); Bianchi v. Griffing, 238 F.Supp. 997 (E.D.N.Y. 1965), appeal dismissed, 382 U.S. 15 (1965); Ellis v. Mayor and City Council of Baltimore, 234 F.Supp. 945 (D.Md. 1964), aff'd, 352 F.2d 123 (4 Cir. 1965). See also Seaman v. Fedourich, 16 N.Y.2d 94, 262 N.Y.S.2d 444, 209 N.E.2d 778 (1965), and authorities cited in Moody v. Flowers, 256 F.Supp. 195, 204 n. 6 (M.D. Ala.1966) (dissenting opinion).

5. Montano v. Lee, Civil No. 11,238, D. Conn., March 24, 1966 (unreported).

6. Ibid.

7. Id. at 2–3.

versy as real, when directed to a municipal election, as when addressed to a statewide election. The gravamen of the complaint in each instance is deprivation of a federally protected right with respect to the integrity of a person's vote.

"The application of the law set forth in Reynolds v. Sims, [377 U.S. 533 (1964)], as applied to legislative bodies of municipalities such as the Board of Aldermen, is not only logical but manifest and compelling. Ellis v. Baltimore, 234 F.Supp. 945 (D.Md. 1964), aff'd, 352 F.2d 123 (4 Cir. 1965). See also Bianchi v. Griffing, 238 F.Supp. 997 [(E.D.N.Y.1965), appeal dismissed, 382 U.S. 15 (1965)]."

This Court accordingly holds that the admitted disproportion in population between the five voting districts in the City of Milford on the basis of which aldermen are elected to the legislative body of that City presents a justiciable controversy over which this Court has jurisdiction.

(B) *Debasement Of Voting Rights In Choice of City Aldermen Constitutes Deprivation Of Federally Protected Right.*

Having held that the Court has jurisdiction over the controversy, there is no doubt, upon the undisputed facts presented by the record in the instant case, that the wide disparity in population between the voting districts in the City of Milford—reflected in a 2:1 ratio between the most populous and least populous districts—so debases the voting rights of plaintiffs in their choice of members of the Board of Aldermen as to result in an invidious discrimination against plaintiffs who thereby are denied the equal protection of the laws in contravention of the Fourteenth Amendment of the United States Constitution.[8] Defendants so concede. The Court so holds.

It is clear that Section 2-1 of the Code of the City of Milford, being the fountainhead of denial to plaintiffs of the equal protection of the laws guaranteed by the Fourteenth Amendment, must be stricken down as void and of no effect, in view of the supremacy clause of the United States Constitution.[9]

What is not so clear is whether the present record likewise requires to be stricken as void and of no effect the provision of Article II, Section 4, of the Charter of the City of Milford requiring each voting district to contain "as nearly as possible an equal number of electors."

Legislative districting or apportionment achieved by use of a registered voters basis may well satisfy the equal protection clause if it produces a distribution of legislators not substantially different from that which would have resulted from the use of a permissible population basis.[10] But a specific factual finding to that effect would be required before apportionment based on numbers of registered voters could be said to comport with federal constitutional standards. The record in the instant case, at this stage of the proceedings, does not support such a finding.

The blanket provision of Article II, Section 4, of the Charter of Milford, requiring each voting district to contain "as nearly as possible an equal number of electors", declares in effect that for all time districting shall be based on numbers of registered voters without regard to whether such numbers are the best available evidence of population at a particular time. As such, this provision denies to plaintiffs the equal protection of the laws guaranteed by the Fourteenth Amendment and must be stricken down as void and of no effect, in view of the supremacy clause of the United States Constitution.[11]

8. Butterworth v. Dempsey, 229 F.Supp. 754 (D.Conn.1964), aff'd sub nom. Pinney v. Butterworth, 378 U.S. 564 (1964).

9. U.S.Const. art. VI, cl. 2.

10. Burns v. Richardson, 384 U.S. 73, 90–97 (1966); cf. Ellis v. Mayor and City Council of Baltimore, 352 F.2d 123, 129–130 (4 Cir. 1965).

11. Supra note 9.

(C) *Appointment Of Special Master To Formulate Plan For Temporary Constitutional Redistricting Of Board Of Aldermen.*

By an order entered April 13, 1967, the Court, upon application and with the consent of all parties, appointed Professor Ralph Karl Winter, of the Yale Law School, as Special Master to formulate a plan for temporary constitutional redistricting of the Board of Aldermen pending adoption, by ordinance or amendment of the Charter or otherwise, of an appropriate redistricting of the Board of Aldermen which shall comport with federal constitutional requirements.

In appointing a Special Master in this municipal legislative redistricting case, the Court wishes to make it clear that, aside from the exceptional nature of this case which is believed to make appropriate the appointment of a Special Master,[12] such action is not to be understood as establishing a precedent for appointment of Special Masters in other municipal redistricting cases which may come before this Court.

In the first place, if similar redistricting cases were to be brought in this Court by any substantial number of the 169 cities and towns of the State, obviously there would be insufficient judicial manpower, even assuming competent Special Masters could be obtained, to formulate redistricting plans for all such municipal legislative bodies.

Of more fundamental importance, however, the task of redistricting legislative bodies where required is primarily a *legislative* function, not a *judicial* function. Such redistricting normally can be accomplished more economically and more responsively to local needs by a municipality's own legislative body than by the Court with the aid of a Special Master. And the Court generally is better placed to pass objectively upon the constitutionality of a plan of redistricting if it has originated in the legislative body than in the Court itself, albeit through the services of a disinterested and well qualified Special Master as in the instant case. In short, it is the function of the Court to adjudicate, not to legislate.

In the Connecticut state legislative reapportionment case,[13] all of the judges concerned with that case—the late Judge Charles E. Clark, Judge J. Joseph Smith, Judge Robert P. Anderson and the undersigned—repeatedly asserted their preference that the necessary redistricting of the Senate and reapportionment of the House be done by the General Assembly rather than by the Court.[14] A Special Master (Morris S. Davis, Director of the Yale University Computer Center) was appointed only after nearly two years of unsuccessful efforts by the Court to persuade the General Assembly to perform its duty of providing the people of Connecticut with a constitutionally valid legislature.[15] Within three months thereafter, the General Assembly in special session enacted legislation, promptly approved by the Court, redistricting the Senate and reapportioning the House [16]—but only after the Special Master had programed for the Court a plan of redistricting and reapportionment to be run on the computer.

In the instant case, it appears that since October 1965 abortive efforts have been made by the Board of Aldermen, by a Charter Revision Commission, by a Redistricting Committee and by political leaders to redistrict the Board of Aldermen. The upshot of these efforts was a resolution adopted by the Board

12. Rule 53(b), Fed.R.Civ.P.; 5 Moore s Federal Practice ¶ 53.05 [1]–[3] (2d ed. 1966); cf. LaBuy v. Howes Leather Co., 352 U.S. 249, 259 (1957).

13. Butterworth v. Dempsey, 229 F.Supp. 754 (D.Conn.1964), aff'd sub nom. Pinney v. Butterworth, 378 U.S. 564 (1964).

14. Butterworth v. Dempsey, 237 F.Supp. 302, 309 n. 2 (D.Conn.1964) (memorandum re relief pursuant to mandate of Supreme Court).

15. Id. at 312–313 (order that Special Master be appointed).

16. Id. at 313 (memorandum on motion for approval of action of General Assembly).

of Aldermen on December 12, 1966 that the boundaries of the five voting districts "be amended by ordinance in accordance with the recommendations of an impartial third party appointed by the U. S. District Court" in the instant case.[17] After unsuccessful efforts by the Court to persuade the parties to accomplish the necessary redistricting without Court intervention, a Special Master, selected by the parties, was appointed pursuant to the order hereto appended.

The Court is satisfied, under the special circumstances here disclosed, that appointment of a Special Master is justified. The case is an exceptional one. The 15 member Board of Aldermen is divided along political lines, 8 to 7. Efforts by the Board of Aldermen, acting through a Charter Revision Commission and a Redistricting Committee, to perform what is primarily the duty of the Board of Aldermen—to redistrict itself—have been without avail. And the hour is late. Nominating procedures for the municipal elections to be held November 7, 1967 will shortly be getting under way; and members of the Board of Aldermen of course no longer can be nominated or elected upon the basis of the present districting of that Board.

Under these circumstances, the Court appreciates the availability of a Special Master so eminently well qualified as Professor Winter who is able and willing to formulate a plan of redistricting within the tight time limits here required.

### JUDGMENT

This cause having been heard November 7, 1966 on plaintiffs' motion for partial summary judgment and on defendants' motion for a stay of proceedings; and

The Court having received and considered the pleadings; the said motions; plaintiffs' request for admission of facts; defendants' admission of facts; the briefs of the parties; and proposed findings of fact, conclusions of law and form of judgment agreed to by the parties; and

The Court on May 31, 1967 having filed its findings of fact, conclusions of law and opinion; it is

ORDERED, ADJUDGED AND DECREED:

(1) That the present districting of the Board of Aldermen so debases the voting rights of plaintiffs as to result in an invidious discrimination against plaintiffs who thereby are denied the equal protection of the laws in contravention of the Fourteenth Amendment of the United States Constitution.

(2) That so much of Section 2–1 of the Code of the City of Milford which, in establishing boundaries for the voting districts in the City of Milford, results in a wide population disparity between the voting districts as a basis for election of members of the Board of Aldermen, being in contravention of the equal protection clause of the Fourteenth Amendment of the United States Constitution, is void and of no effect.

17. The complete resolution is as follows:
"RESOLUTION
At a Recessed Meeting of the Board of Aldermen of the City of Milford held December 12, 1966, the following Resolution was adopted:
WHEREAS, THE BOARD OF ALDERMEN OF THE CITY OF MILFORD are desirous of redistricting the local voting districts,
NOW, THEREFORE, BE IT RESOLVED BY THE BOARD OF ALDERMEN OF THE CITY OF MILFORD THAT, it is the declaration and sense of this body that the boundaries of the five voting districts of the City of Milford be amended by ordinance in accordance with the recommendations of an impartial third party appointed by the U. S. District Court having jurisdiction in the case of Andrew Kapral et al vs Alan H. Jepson, Mayor et al, Civil Action #11470.
Attest:
Margaret S. Egan
City Clerk
Dated at Milford, Conn.,
this 13th day of December,
1966."

(3) That so much of Article II, Section 4, of the Charter of the City of Milford as provides that each voting district shall contain ". . . as nearly as possible an equal number of electors . . .", to the extent that said provision imposes limitations upon equality of population between the voting districts as a basis for election of members of the Board of Aldermen, being in contravention of the equal protection clause of the Fourteenth Amendment of the United States Constitution, is void and of no effect.

(4) That defendants Alan H. Jepson, Margaret S. Egan, John R. Le-Geyt and the members of the Board of Aldermen of the City of Milford, their privies and their successors in office, are enjoined from doing any act or taking any step in furtherance of nominating or holding elections of members of the Board of Aldermen of the City of Milford, and said defendants are further enjoined from certifying or in any other manner declaring that the results of any such nominations or elections are valid or that the Board of Aldermen of the City of Milford is properly or legally constituted, unless *either*

(a) all members of the Board of Aldermen are nominated and elected from the City of Milford at large, *or*

(b) all members of the Board of Aldermen are nominated and elected pursuant to a redistricting of the Board of Aldermen to be effected promptly by adoption of an appropriate ordinance by the Board of Aldermen altering the boundaries of the voting districts so that the voting rights of plaintiffs in the choice of members of the Board of Aldermen as guaranteed by the equal protection clause of the Fourteenth Amendment of the United States Constitution will not be impaired, *or*

(c) all members of the Board of Aldermen are nominated and elected pursuant to a plan to be approved by this Court not later than July 1, 1967 to provide for temporary constitutional redistricting of the Board of Aldermen pending adoption, by ordinance or amendment of the Charter of the City of Milford or otherwise, of an appropriate redistricting of the Board of Aldermen which shall comport with federal constitutional requirements; such temporary plan of redistricting to be based upon a report to be filed with the Court by the Special Master heretofore appointed by an order of this Court dated April 13, 1967, a copy of which order is hereto appended.

(5) That the provisions of this judgment shall be effective immediately upon the entry hereof and shall apply to the election of members of the Board of Aldermen scheduled for November 7, 1967, as well as to all elections of members of the Board of Aldermen thereafter.

(6) That plaintiffs' motion for partial summary judgment is granted to the extent provided herein.

(7) That defendants' motion for stay of proceedings is dismissed as moot.

(8) That taxation of costs shall be held in abeyance pending action by the Court upon the application of the Special Master for compensation and reimbursement of expenses as provided in paragraph (6) of the said order of this Court dated April 13, 1967.

(9) That jurisdiction of this action is retained for the entry of such further orders or judgments by the Court as may be necessary and appropriate.

## APPENDIX A

### ORDER APPOINTING SPECIAL MASTER

Plaintiffs and defendants having applied, pursuant to Rule 53, Fed.R.Civ.P., for appointment of a Special Master to formulate, under instructions from the Court, a plan for redistricting the Board of Aldermen of the City of Milford, Connecticut; and

The Court being of the opinion that this is an exceptional case in which it is appropriate that the Court appoint a Special Master to aid the Court in discharging its responsibility, if need be, to provide for temporary constitutional redistricting of the Board of Aldermen of the City of Milford pending adoption, by ordinance or amendment of the Charter of the City of Milford or otherwise, of an appropriate redistricting of the Board of Aldermen which shall comport with federal constitutional requirements; it is

ORDERED as follows:

(1) That Professor Ralph Karl Winter, of the Yale Law School, New Haven, Connecticut, be, and he hereby is, appointed Special Master and is authorized and directed to formulate a plan for redistricting the Board of Aldermen of the City of Milford in accordance with the following instructions.

(2) That the plan to be formulated by the Special Master shall be based upon the following considerations:

(a) There shall be 5 aldermanic voting districts.

(b) Each district shall be composed of contiguous territory only.

(c) Each district shall be as compact as possible as is consistent with the equal population considerations specified in subparagraph (d) which immediately follows.

(d) Each district insofar as practicable shall be of substantially equal population and shall be formed so as to result in the minimum deviation from the population norm for each district consistent with the consideration of maximum compactness specified in subparagraph (c) above.

(3) That the Special Master shall give consideration to the feasibility and advisability of utilizing an appropriate electronic computer technique to minimize partisanship in redistricting the Board of Aldermen; if the Special Master determines that utilization of such computer technique will be feasible and advisable, he may apply to the Court for authorization to engage the services of competent computer personnel.

(4) That the Special Master shall also give consideration to the feasibility and advisability of utilizing, on a consulting basis or otherwise, the services of any nonpartisan expert or experts in the field of legislative districting, including, but not limited to, James B. Weaver, Chairman of the Board of CROND, INC. (Computer Research On Nonpartisan Districting); if the Special Master determines that utilization of such expert services will be feasible and advisable, he may apply to the Court for authorization to engage such expert services.

(5) That the Special Master shall proceed in accordance with Rule 53, Fed.R.Civ.P., insofar as applicable, and shall file his report with the Court not later than June 1, 1967.

(6) That the compensation to be allowed to the Special Master shall be fixed by the Court upon application by him promptly after the filing of his report and the completion of his services. In addition, the Special Master shall be reimbursed for all reasonable expenses necessarily incurred by him in the discharge of his responsibilities under this order. The compen-

sation and expenses of any computer personnel or other experts shall be authorized by this Court before such personnel or experts are engaged. All compensation and expenses of the Special Master and of any computer personnel or experts shall be taxed as costs in this action against the defendants Alan H. Jepson, Margaret S. Egan, John R. LeGeyt, and the members of the Board of Aldermen of the City of Milford, or their successors in office, in their official capacities.

Dated at New Haven, Connecticut, this 13th day of April, 1967.

## APPENDIX B

### ORDER TO SHOW CAUSE WHY REPORT OF SPECIAL MASTER SHOULD NOT BE ACCEPTED

The report of the Special Master having been filed herein June 1, 1967 pursuant to this Court's order of April 13, 1967; and

Copies of the report of the Special Master having been furnished to counsel for the parties to this action and the Clerk of this Court having notified counsel of the filing of said report; and

The Court being of the opinion that the interests of the respective parties to this action, as well as the public interest, requires the promptest possible action by the Court on the said report of the Special Master in order that nominating procedures for the municipal elections to be held in the City of Milford on November 7, 1967 may proceed upon the basis of an appropriate redistricting of the Board of Aldermen to comport with federal constitutional requirements; it is therefore

ORDERED that all parties to the instant action show cause why the said report of the Special Master should not be accepted by the Court, pursuant to the following schedule:

(1) Written objections, if any, to the said report shall be served and filed not later than Friday, June 9, 1967 at 4:00 P.M.

(2) A hearing on any such written objections to the said report of the Special Master shall be held before the undersigned in the second floor courtroom of the United States Courthouse, New Haven, Connecticut, on Monday, June 12, 1967 at 10:00 A.M., or as soon thereafter as counsel can be heard.

(3) In the event no objections to the said report of the Special Master are filed as hereinabove provided, the Court will take such action on the said report as it deems proper and will do so on June 9, 1967, or as soon thereafter as possible.

(4) The Clerk of this Court is directed to mail copies of this Order To Show Cause to counsel for the respective parties and to the Special Master not later than June 1, 1967, such mailing to constitute sufficient notice of proceedings with relation to the said report of the Special Master ordered herein.

Dated at New Haven, Connecticut, this 1st day of June, 1967.

## APPENDIX C

### ORDER ACCEPTING REPORT OF SPECIAL MASTER

This Court on June 1, 1967 having issued an order to show cause requiring all parties to show cause why the Court should not accept the report and exhibits filed by the Special Master on June 1, 1967 pursuant to this Court's order of April 13, 1967; and

No written objections to said report and exhibits having been filed by June 9, 1967, at 4:00 P.M. as required by the said order to show cause, ¶ 1; and

This Court having independently reviewed and considered said report and exhibits; it is therefore

ORDERED that

(1) The findings of fact and conclusions of law contained in said report be, and the same hereby are, accepted and adopted in full by the

Court, pursuant to Rules 52(a) and 53(e)(2), Fed.R.Civ.P.

(2) Said report as approved in full on this date by the Court shall, and the same hereby does, constitute the temporary constitutional redistricting plan to which reference is made in ¶ (4) (c) of the judgment of this Court dated May 31, 1967.

(3) The Clerk of this Court is directed forthwith to mail copies of this order to counsel for the respective parties and to the Special Master.

Dated at New Haven, Connecticut, this 9th day of June, 1967.

## REPORT OF SPECIAL MASTER

To the Honorable William H. Timbers, U. S. District Judge:

Plaintiffs brought this action to compel defendants, the Mayor, the City Clerk and Town Clerk, the Chairman of the Board of Aldermen and the Board of Aldermen of the City of Milford, Connecticut, to compel a reapportionment of the Board of Aldermen of that City so that each aldermanic district would contain "as nearly as possible an equal number of persons." A motion for summary judgment for plaintiffs was not opposed and Chief Judge William H. Timbers, upon the request of the parties, entered an order appointing the Special Master and authorizing him to formulate a plan for the redistricting of Milford by June 1, 1967.

Judge Timbers' order directs that the plan provide for five contiguous aldermanic voting districts. The districts are to be as compact as is practicable in light of the goal of fashioning district lines which substantially equalize the population of each district. The order also authorizes utilization of appropriate electronic computer techniques if the Special Master finds such devices would aid him in formulating a plan.

The threshold problem is fashioning aldermanic districts of substantially equal total population, rather than registered voters, adults, etc., is determining basic geographical units for which reliable evidence of total population is available. A complete census, taken in units specified by the Special Master, would of course be the most reliable method. But that is not practicable in view of the expense it would entail and the need for an early decision in this case. Next best would seem to be population data from the 1960 census. But a census taken almost seven years ago may not be very useful to prove total population today. Such data is reliable evidence only if population has changed in a relatively identical fashion in each of the basic geographical units involved. If, for instance, the population of some units has substantially increased while in others it has declined or remained stable, redistricting on the basis of 1960 population figures might even worsen the apportionment in terms of the basic goal of equally populated districts. Another assumption upon which employment of 1960 data rests is that it is available in a form which permits the Special Master to accommodate the sometimes competing goals of contiguity, compactness and substantially equal population. If the basic geographical units are too large, for instance, it may be impossible to achieve five contiguous and compact districts which even approach equality of population. In this case I find that use of the 1960 census data for redistricting purposes is not feasible.

In an era of construction which permits the rapid concentration of people where there were few before and of redevelopment programs which often leave few where there once were many, population data does not improve with age. In the present case, the parties have agreed, S.M. Ex. 4, #4, that because of redevelopment programs and other factors, population changes within the City of Milford since 1960 have not been evenly distributed throughout the geographical units employed in the census of 1960. Further evidence of this fact can be gleaned from changes in voter registration, which, as established below, has a close relationship to total population. Since 1960, the two aldermanic districts

which have total population substantially exceeding the norm of 8,332 (based on the City's total population of 41,662 in 1960), the First and the Fourth, have experienced an increase in the number of registered voters. In the remaining three districts, all of which are below the norm, a decline in the number of voters has occurred. S.M. Ex. 4, #5. I find, therefore, that population changes in the City of Milford have not been evenly distributed over the geographical units employed in the 1960 census and that, for this reason, the data available from that census is an unreliable indicator of population for redistricting purposes.

But there is yet a second reason for not using that data. The basic geographic unit employed by the census is the Enumeration District (hereinafter E.D.). In 1960, Milford was divided into forty-four E.D.'s by the Bureau of the Census. Since the total population of the City at that time was 41,662, the average E.D. consisted of somewhat less than 1,000 persons, a figure sufficiently high to render districting into five contiguous, compact districts with a population of close to 8,332 a difficult task at best. But the E.D.'s themselves are not of substantially equal size in terms of population. See S.M. Ex. 1. Three of them contain more than 2,000 persons, the largest being 2,241, or better than 25% of what would be an ideal district. Nineteen others contain better than 1,000 persons, while six have less than 100, the smallest having only 1. The number of possible plans available though use of the 1960 E.D. data is, therefore, not large. S.M. Ex. 2 represents a map of the Milford E.D.'s with two possible plans and

the present aldermanic districts.[1] While a plan which achieves approximate equality of population (in plan I on S.M. Ex. 2, for instance, the largest deviation from the norm is only 5%) can be drawn, it would not be consistent with Judge Timbers' order. The E.D.'s come in all geographical sizes and shapes and, as S.M. Ex. 2 vividly demonstrates, aldermanic districts fashioned on the basis of the 1960 E.D.'s seem more suitable for ink-blot tests or jig-saw puzzles rather than election districts. Judge Timbers' order specified that the Special Master take compactness into consideration as well as equality of population. Neither goal can be satisfactorily achieved if the 1960 census data—which is both out of date and not in a useable form—is employed as the basis for the redistricting plan.

Given the impracticability of taking a special census and the deficiencies inherent in the 1960 data, use of voter registration lists seems the only viable alternative. The advantages gained through the use of such lists are by no means insubstantial, even though utilization of appropriate computer techniques is not feasible. They are necessarily more current than raw population data. And since voter registration lists are compiled by streets, redistricting can, through use of an appropriate city directory, proceed on the basis of units as small as one side of one block. The precision thus attainable, both in terms of population equality and compactness, far exceeds that available through use of E.D.'s.

Redistricting, however, according to Judge Timbers' order, must seek equality of population rather than equality of registered voters. But the number of

1. The plans demonstrated by this exhibit were originally suggested by James B. Weaver, Chairman of the Board of CROND, INC. (Computer Research on Nonpartisan Districting). Paragraph (4) of Judge Timbers' order of April 13, 1967, authorized the Special Master to consider engaging the services of a nonpartisan expert such as Mr. Weaver, if the Special Master found that utilization of such services would be feasible and advisable. I did confer with Mr. Weaver and serious consideration was given to applying to the Court for permission to engage him since it seemed plain that Mr. Weaver would be most helpful in determining, through appropriate computer techniques, the optimum utilization of 1960 census data. The deficiencies subsequently found to be inherent in that data, however, prevented me from pursuing this otherwise promising approach.

registered voters in a district may be persuasive evidence of the total population of that district. Indeed, the Supreme Court held in Burns v. Richardson, 384 U.S. 73 (1966), that apportionment on the basis of registered voters satisfies the Equal Protection clause if it can be demonstrated that the result is "not substantially different from that which would have resulted from the use of a permissible population base." Id. at 93. Thus, while a Charter provision which compels for all time districting on the basis of registered voters rather than total population may be invalid, a particular apportionment might well utilize voters if appropriate findings of fact indicate that voting lists are the best available evidence of population. A Charter provision such as that described above is essentially different because it discards the necessity of making such findings each time apportionment is undertaken and compels use of voting lists even in circumstances in which better census data is available. In this case, however, the appropriate finding can be made.

The relationship of registered voters to population can be established in this case by comparing the number of voters in each district in 1960 to the district's population. The difficulty is that exact population figures for each aldermanic district are not available since census E.D.'s often overlap district lines. E.D. 45, for instance, with a population of 2,220, is in both the First District and the Second, while E.D. 67A, with 2,007 people, overlaps the Fourth and Fifth Aldermanic Districts. See S.M. Ex. 2. Estimates, however, can be made by attempting to locate the centers of population—principally by assuming that more people live where there is a preponderance of streets on a map than where there is not [2]—within each such E.D. on a map of Milford obtained from the Bureau of the Census. S.M. Ex. 3. The estimated percentage relationship of 1960 registered voters to total population can then be determined:

|  | 1960 Pop. (est) | 1960 Reg. Voters | % Voters to pop. |
|---|---|---|---|
| First District | 8,817 | 4,459 | 51% |
| Second District | 6,630 | 3,420 | 52% |
| Third District | 7,556 | 3,609 | 48% |
| Fourth District | 10,874 | 4,864 | 45% |
| Fifth District | 7,785 | 3,724 | 48% |
| Total | 41,662 | 20,076 | 48% |

The relationship of total registered voters to total population, therefore, seems fairly close. The largest deviation from the average is only 4%, and the difference between the districts with the greatest and smallest percentage relationship is only 7%. It should be noted, moreover, that these districts, the Second and the Fourth, encompass portions of large E.D.'s which overlap other

2. The parties agreed to slightly different estimates in the plaintiff's Requests for Admissions. The difference results from the fact that they assumed that the percentage of geographical area of an E.D. which was in an aldermanic district approximated the percentage of that E.D.'s population in that district. Thus, they apparently attributed close to 50% of E.D. 45 to the First District because half of that E.D. is in that District. I attempted, however, to be more precise and to locate the concentrations of population in an E.D. when it was in more than one aldermanic district. Thus, because it is plain from the location of streets in E.D. 45, see S.M. Ex. 3, that most of that E.D.'s population is in the Second District, I attributed 1,820 people to the Second and only 400 to the First.

districts. It is quite possible, therefore, that the deviation is in fact smaller than estimated. In any event, the relationship is sufficiently precise to permit a finding that voter registration lists are, at this time, the best available evidence of total population for purposes of redistricting and that districts fashioned on the basis of voter lists would not differ substantially from districts based on accurate and useable population data.

The problem of fashioning new districts from voter registration lists, while time consuming, is not difficult. The norm for each new district, based on the 1966 voter lists, is 4,142. The number of voters which must be added or taken from each district is then easily determinable. Because the number of districts is to remain at five, the present districts serve as a base from which the redistricting can begin. The number of people living in a particular area can be determined from the voter registration list of the appropriate district and contraction or expansion of districts can proceed with a view both to equality of population and compactness. The principal difficulty is that expansion of the Third District is possible only at the expense of either the Second or Fifth Districts, which themselves have too few voters. The net result is that the Fifth District has been for practical purposes picked up and moved eastward, thus losing the Silver Beach area but gaining a large portion of the existing Fourth District, including Gulf Beach and Welch's Point northeast to Pond Point Avenue. S.M. Ex. 6.

The districts under the plan, S.M. Ex. 6 (the map is to govern any conflict between it and the verbal description), are as follows:

### First District

From the Orange town line southwesterly along the N.Y., N.H. & H. R.R. tracks to the Boston Post Rd. Northeasterly along the Post Rd. to the Milford Parkway. Thence northwesterly to the Milford Parkway to the Wilbur Cross Parkway to the Housatonic River.

### Second District

Southern boundary is the creek running from the Milford Reservoir to Bridgeport Avenue northeasterly to the Post Road to the Milford Parkway. Thence northwesterly on the Milford Parkway to the Wilbur Cross Parkway to the Housatonic River.

### Third District

Northern boundary is the creek running from the Milford Reservoir northeasterly to Bridgeport Avenue, southerly on Seemans Lane, easterly on Meadowside Road, southerly on the Robert Treat Parkway and Surf Avenue to Long Island Sound.

### Fourth District

From the Orange Town line southwesterly along the N.Y., N.H. & H. R.R. tracks to Old Gate Lane, southerly to New Haven Avenue, easterly to Pond Point Avenue, southeasterly to Welch's Point Road, southwesterly to Buckingham Avenue, southeasterly to Calf Pen, southerly to Long Island Sound.

### Fifth District

Northwesterly from Long Island Sound along Surf Avenue and the Robert Treat Parkway to Meadowside Rd., westerly to Seemans Lane, northerly to Bridgeport Avenue, westerly to the Post Road, northerly to the R.R. tracks, northeasterly to Old Gate Lane, southerly to New Haven Avenue, easterly to Pond Point Avenue, southeasterly to Welch's Point Road, southwesterly to Buckingham Avenue, southeasterly to Calf Pen, southerly to Long Island Sound.

The redistricting plan is quite satisfactory in terms of equal population.[3]

---

3. There is always the danger that mistakes in counting, etc., will lead to error in the final tabulation for each district. Care has been taken in this case to avoid such error, see S.M. Ex. 7, the Childers' affidavit. But the possibility can never be entirely eliminated. Nevertheless, what error there may be in the stated figures, if there be error, must surely be *de minimis*.

The total of registered voters in each district in 1966 and in the plan is:

|  | 1966 | Plan |
|---|---|---|
| First District | 4,916 | 4,151 |
| Second District | 3,288 | 4,058 |
| Third District | 3,497 | 4,277 |
| Fourth District | 5,351 | 4,043 |
| Fifth District | 3,656 | 4,179 |

The largest deviation from the norm of 4,142, therefore, is only 135 voters or 3%. Although this deviation is minor, it too could be virtually eliminated under the voter list method but only at the cost of compactness. Further attempts to achieve equality would, I find, further disrupt the contours of the proposed districts for almost no worthwhile purpose.

The proposed plan comprises districts which I find to be as compact as possible in view of the goal of equality of population. The sole exception involves the boundary of the First and Second Districts, which proceeds in a generally northeasterly direction to the Milford Parkway and then shifts abruptly to a northwesterly direction. This occurs because it was thought best to employ natural boundaries where possible, and the Milford Parkway and Boston Post Road appear to be such boundaries. The most natural direction for expansion of the Second District is generally northerly and the most natural boundary in that area is the Milford Parkway. And while further northerly expansion would eliminate the uneven easterly boundary, the northern boundary would necessarily become a ziz-zag of some sort. In any event, the compactness requirement is based on a desire to eliminate partisan or other extraneous considerations from districting and perhaps to facilitate contact between constituents and representatives. Since in fact the uneven, jutting northeast corner of the Second District contains more parkway clover-leafs than registered voters, I find the policy underlying the compactness requirement does not apply in this circumstance and, therefore, may permissibly give way to the adoption of natural boundaries. All other district lines are consistent with the compactness requirement and, fortunately, with natural boundaries. The New Haven Railroad tracks continue to divide the First District from the Fourth and Fifth and water separates the Second from the Third and the Fifth from the Fourth. I find, therefore, that the proposed plan is more consistent with the requirements of Judge Timbers' order of April 13 than any other. This report shall serve as my findings of fact and conclusions of law under Rule 53, Fed.R.Civ.P.

Dated at New Haven, Connecticut, this 1st day of June, 1967.

Respectfully submitted,

/s/Ralph K. Winter, Jr.

Ralph K. Winter, Jr.
Special Master